Mr. Verrilli. Mr. Chief Justice, and may it please the Court, Congress enacted the statute at issue, which I will refer to as Paragraph 14, to curb the discretion HHS normally enjoys when it sets Medicare rates for outpatient hospital services. For the drugs covered by the statute, Paragraph 14 directs that the agency may set rates based on acquisition costs, and may not set rates based on acquisition costs. and vary rates by hospital groups if it conducts a cost study that meets the requirements of the paragraph. If it does not do a cost study, rates must equal the average price for the drug, determined by a cross-reference statutory formula, calculated and adjusted as necessary for purposes of the paragraph. Now, in the order at issue, HHS set rates for Section 340B hospitals, different from the rates for all other hospitals, and purported to base those rates on the cost of the drug. But it did not conduct the cost study that the statute requires. Now, at the threshold, the government asserts that courts cannot review that agency action, that no statutory text precludes review, and it makes sense that Congress would want review, because the point of Paragraph 14 was to constrain agency discretion. On the merits, the government asserts that separate cost-based rates for 340B hospitals can be justified as an exercise of the agency's authority to adjust price-based rates that the statute requires in the absence of a cost study. But Paragraph 14 does not authorize HHS to vary price-based rates by hospital group, and it authorizes varying cost-based rates only in the presence of a cost study. And beyond that, HHS didn't base the rates it set for 340B hospitals on average price at all. It estimated the acquisition cost using a different formula, and then swapped that number in for the average price number. That's a substitution. It's not an adjustment. And it can't be justified under Chevron. Congress spoke directly to the question of when rates can be based on acquisition cost and varied by hospital groups, and that's when it conducts a cost study. Congress surely did not delegate to HHS the authority to remove that statutory requirement. I welcome the Court's questions. Mr. Varelli, if we don't agree with your last statement, but rather with the D.C. Circuit, and its application to Chevron, and that we agree that Chevron disposes of this, would you argue or are you arguing that we should overrule Chevron to get to the statutory approach that you're taking? Well, I think, Your Honor, the way we've approached that question is that we think with respect to the application of Chevron to the D.C. Circuit, we are asking the Court to reject the D.C. Circuit's application of Chevron. But there are several steps before getting to that final question that Your Honor asked. We do think that what the D.C. Circuit did was essentially go hunting for ambiguity and purport to find it by finding superfluity in one provision, superfluity in another, and saying there's no hierarchy of superfluity throwing up its hands and deferring. So we think this is a situation in which the statute is clear, unambiguous at the first stage of Chevron, and therefore one doesn't get to the question of whether Chevron needs to be overruled. And even if the Court finds some ambiguity in that with respect to the statute, we think this is a case very much like MCI, or very much like the Iowa Utilities Board case, which is cited at page 16 of the chamber brief, in which whatever ambiguity and therefore discretion the agency has, this is a case in which the Court finds some ambiguity in that with respect to the statute. And so far outside of it, because it effectively writes this provision out of the statute entirely, and Congress can't possibly have intended to delegate the agency authority to do that. Why? I mean, you understand this better than I do. Look at paragraph 14. Okay, we're in this thing that says Roman numeral II down here on page 42A. And it says now, what we're trying to do here is we'll pay them back for what they pay the hospitals, that's one. But if you can't figure out what they pay, then look at the price of the drug. That's two. And then it says, as calculated and adjusted by the Secretary, as necessary for purposes of this paragraph. So I thought, A, what's the paragraph? The paragraph is 14. That's made pretty clear, because above they say E is a subparagraph, okay, so the paragraph must be 14. Now, I read 14 two or three times. And I say, what's the point of that? And the point seems to be to pay the hospitals what they actually pay for the drugs, which sometimes you can figure out and sometimes you can't. And when it says adjust for purposes, they mean adjust so that you get closer to what the hospitals are really paying for these drugs. And so they did. So where am I wrong? I think there's a fundamental precept at stake here, which is that Congress doesn't just legislate objectives. It legislates the means by which those objectives are to be accomplished. This says for purposes of this paragraph. And purposes refers to, I think, objectives. But what I think the objective of this paragraph is that this paragraph is all about the means. Remember, the provenance of this paragraph is that previously these rates were set under the general Section 2 authority that the agency had, and that was producing unsatisfactory results. And so Congress pulled this out of the Section 2 methodology and said, we are actually going to prescribe in minute detail the means by which you are going to calculate the rates. They did. Why did they pull it out? What word did you just use? They pulled it out because it was unsatisfactory. Correct. All right. Now, if it's unsatisfactory, we want a more satisfactory. What counts as satisfactory? Getting closer to the cost and lowered purposes. No, I think the purpose of the statute is evident on its face, and the purpose of the statute is to ensure reliability and accuracy and transparency in the methods that Congress has prescribed for calculating the rates. Accuracy and transparency in the calculation of average cost rates by using the cost study. Accuracy and transparency in the calculation of price-based rates using the statutory formula is just as necessary for purposes of the paragraph. But to read for purposes of the paragraph language as giving them carte blanche to, A, set acquisition cost rates, and, B, vary those rates between hospital groups, which is the key point here, of course. They have varied the rates between hospital groups without doing a cost study that subparagraph one says you have to do to do those things. Well, I don't know. Maybe accuracy, but the transparency of section 1395LT14A32, they haven't succeeded in that objective. But it does seem to me you have to have some limiting principle for what necessary for purposes of this paragraph means, or your case is pretty, well, I think it might be wrong, right? Because you have to say that doesn't mean they can do what they would otherwise do under Roman numeral I. Correct. So what does it mean? I mean, purposes of this paragraph seems pretty unlimited. You know, I don't think it can be read as unlimited, Your Honor, for the reason that it creates this giant superfluity problem. Subparagraph one seems very clearly to say that rates shall be equal to acquisition costs determined by the secretary taking into account the cost study. All of that becomes irrelevant if one reads paragraph of the second subclause that way, and that seems to me itself to be a very significant constraint on the extent to which the agency can align. So what do you think purposes means? So I think purposes means that when the agency is following the methodology for rates based on acquisition costs, that it needs to follow the steps that the statute prescribes to ensure that those rates are as accurate and transparent as possible. This is kind of a catch-all at the end. The secretary can adjust the cost that he's come up with for the purposes. But the price-based rates are calculated in an entirely different manner. That statute that is cross-referenced in subclause two takes you to another statute, and that other statute contains a very detailed formula for how one calculates a price-based rate. And one looks at entirely – the agency has to look at an entirely different set of data. For the subclause one acquisition cost analysis – What does that adjust? Are you saying it can only be up to 1 percent, up to 10 percent? No, I'm saying that it needs to be – the adjustment to the price-based rates has to be consistent with the authority to set price-based rates. So they can make adjustments, for example, as we have argued. They can make adjustments for overhead to ensure that there's fair compensation. There are other kinds of adjustments that they can make to fill in gaps in that statutory formula. Like what? I mean, just to be more concrete here. Because I understand the basic point that this phrase shouldn't be taken to give the secretary authority to circumvent Roman numeral I. But what is left? I mean, the overhead costs seem to be provided for elsewhere. So what are these adjustments that this Roman numeral II provision is talking about? So let me talk about overhead costs, and then I'll give you some other examples. With respect to overhead costs, it isn't entirely taken care of. Paragraph 14E gave authority to adjust for overhead for two calendar years. Thereafter, the authority flows from this paragraph. And although there is a plus 6 percent figure built into the price formula in the cross-reference statute that I identified, it could well be that for some particular drugs that is inadequate. For example, these are extremely serious, significant drugs, chemotherapy drugs, radiation therapy drugs, et cetera. Some of them come with very high handling costs, refrigeration, special treatment, et cetera. So one might adjust that formula in order to ensure that there's fair compensation for that. There are other situations. I can give you some specifics in the statute, but there are other generic situations that one can imagine. Let's say year over year over year, the average price for a particular drug is coming in at a certain level, and then the data comes in for a particular year, and somehow it's dropped by 80 percent, and that seems like an anomaly. That's a situation, it seems to me, in which the agency would exercise its authority to adjust the results of the statutory formula to bring them into line with a more accurate average price. And then some other specifics. When we cite at page 24 of our brief, which is the statutory discretion in the cross-reference formula to include other price concessions in calculating the average price, they've got to make a judgment. Are they going to be in? Are they going to be out? That's an adjustment. Another one is 1395W3AC2B, excuse me for the long references, but they are what they are in this case. That's a discretion to exclude certain sales from an entity that are nominal in amount. The agency has to make a judgment about that. That's an adjustment. Another one, there's section 1395W3AC4, payment rules for when prices are not available, when they don't actually have the data. They've got to estimate that. That's an adjustment. All of those adjustments are done, though, to bring that average price number into line, making it a more accurate average price number. And again, I do think the key point here is that the main thing that happened here... But aren't those adjustments the adjustments that lead to the average price number? What Roman numeral II, I don't know even how to do this, is referring to are adjustments made to the average price. So any adjustments that are being made in saying what the average price is has already been done. Now the Secretary has additional authority. I don't think one needs to read that provision that way at all, Your Honor. It says calculated and adjusted, and I think if one reads those two words together, it's conveying the sense that I'm describing of what the Secretary's responsibility is or authority is. You're trying to come up with a more accurate number. And particularly when we're talking about varying rates by hospital group, you cannot determine on the basis of the price data that that statutory cross-reference requires the agency to look at what the rates for hospital groups are because that's data that comes from manufacturers. It's not broken out by hospital group. It's the average sale price of the manufacturers to everyone. And I gather you think that under subparagraph two, the Secretary can make distinctions among providers. You say it can't make distinctions among hospital groups, but it can make distinctions between hospitals in general and other providers. Is that right? That's what I understand you just say on page 44 if you're brief. I think if the data would allow them to make meaningful price distinctions, then I don't read the statute as foreclosing it. The problem, of course, is that the data that the statute requires them to consider doesn't allow them to make those distinctions because the data isn't broken out by hospital versus non-hospital purchaser. Well, you say on page 44 the agency could adjust average price numbers to focus more closely on price paid by hospitals since those numbers include other kinds of medical providers as well. So I took that to mean you can draw a distinction between hospitals and other providers. Is that right? If the data supports it, I think that that wouldn't be outside of the scope of the authority, but the statutory authority here that the agency would have to have is the authority to vary the rates among hospital groups. What do you find in subparagraph 2 that provides the basis for a distinction between adjusting prices among hospital groups versus adjusting prices paid by all hospitals versus other providers? I think the key point is that subclause 1 confers authority to vary among hospital groups if a condition is met, a cost study. Subclause 2 doesn't contain that authorization to vary among hospital groups. It just isn't there, and that seems to me quite significant. Congress granted it in the first subclause, did not grant it in the second subclause, and I think the reason for that is because Congress wanted to infer this because there really isn't any legislative history here, but I think the reason that Congress made that distinction is because it's a significant thing to break out hospital groups and have them be reimbursed at differential rates, and so if you're going to do that, we want to make sure that you're acting on reliable numbers. You have to look at the acquisition cost data. It has to be statistically significant. You've got to take the steps that the statute requires, and then you can make those judgments, and I think there's actually common-sense reason why Congress would have wanted that. Is there any dispute here that the 340B hospitals pay a lot less? No, it's certainly a subsidy. It's not disputed, right? No, it's not disputed. It's a subsidy here, but, of course, it's a subsidy that Congress was well aware of when it enacted Paragraph 14. The 340B program had been in effect for a while, and, in fact, that statute that Congress cross-references in the second subclause to calculate the rates, it specifically says that the discounts provided at 340B hospitals shall not be included in that calculation, and the agency recognizes that at page 53 of the joint appendix, so it would be very odd to say that Congress said, don't consider that when you're factoring in this number, but then let it back in the back door by allowing an adjustment that effectively sets a different cost-based rate for 340B hospitals without doing the very thing that the statute requires as a precondition. Mr. Verli, should we care about the difference between the word cost and price? Does price do any work here? So I think that, Justice Barrett, what matters there is that in the operation of this statute, the cost and price are two different things because they go to two different data sets. The calculation of cost under the first subclause requires the agency to get data from the hospitals about what they actually spent, so it provides a more accurate basis for assessing what the cost is, and then, in turn, an accurate basis for varying among hospital groups. The price data, as I said earlier, the average price provision in subclause 2, as I said earlier, cross-references the statute, which then tells the agency to look at data that they get from the manufacturers, and then that statute is very detailed. It says include these kinds of rebates, don't include those kinds of rebates. Include these kinds of discounts, don't include those kinds of discounts, and come up with, and the statutory text is the average price for the drug for the year. And I think that's a good argument for you because it's hard. I mean, there's a difference between the sticker price for on a car and what the actual cost is when I leave the lot, and price does seem like something like the, as you point out, the definite article, the average price. I take your point. It seems harder to vary. And then I do think that this goes to what the meaning of adjust is here. Now, we've gone back and forth in the briefs about whether you can have a major adjustment or a minor adjustment, but I do think with respect to the meaning of the word adjust, at a minimum, what it does is require you to have a consistent baseline. You start with A and you adjust A. You don't start with A and substitute something totally different in for it and call it an adjustment. Counsel, I'm looking not at cost or price because, as I see it, price is what an acquisition cost is based on data that shows the actual price or cost, but the average acquisition, the average price for the drug is gotten from manufacturers and you have this very rigorously articulated system to decide cost. And under the three subdivisions, basically Congress says, you can look at this plus X, Y, and Z discounts but not A, B, and C discounts. And one of the A, B, and C discounts they don't let you look at is the 340B. That's what you mentioned earlier, correct? And I think you have a stronger argument to say, if Congress says you can't include the 340B cost, then you can't add it back in and adjust it later when they've restricted you from using it once already. I have a more difficult time buying your argument that a word as broad as adjust, for purposes of this paragraph, would limit the agency altogether from deciding that there were regional differences that had to be compensated. So, for example, if there were higher wages in one part of the country as opposed to another, I don't see why the agency couldn't and wouldn't say, for the Northeast we think the ASOP should be 8% as opposed to 6% because wages are comparable to overhead costs and we should vary the ASOP on that basis. And so I have problems with your argument that in all situations we should say the agency can't define regional differences or can't define hospital groups. I find there's a stronger argument to say they can't do it on 340B because acquisition cost says you can't base it on that. So, Your Honor, given that you seem to have embraced at least part of our argument, I'm hesitant to put it back. No, you're hesitant. But I do want to increase it a little bit because I do think the provenance of the statute matters. That's the kind of judgment that the agency could make prior to the enactment of Paragraph 14 when it was calculating rates under Paragraph 2. That's exactly what Paragraph 2 authorizes the agency to do is make those kinds of distinctions. And what Congress did was pull these judgments out of Paragraph 2 and say, no, no, we're not going to have you make those kinds of distinctions anymore, and you can set rates based on acquisition costs if you've got the reliable, transparent data. And if I could just make a point about that, I think an important reason why Congress would want that kind of reliable, transparent data as a basis for varying among hospital groups is to avoid political favoritism and avoid powerful interest going into the agency and jawboning the agency into giving them higher rates based on whatever formula they can come up with. What this statute does is say, no, no, there's one way to do this and one way only. That is get the acquisition costs, do a statistically significant analysis of them, and if you can justify the differences based on that transparent data that we, Congress, can look at and the public can look at, go ahead and make that. If you don't have that, no variations among hospital groups. And then I do think that goes back to the statutory language about the average price for the drug for the year, which seems to me very clearly to be an indication of Congress that there is a single average price for the drug for the year, and the absence of any statutory authority to vary among hospital groups when undertaking that task. And I think it's, again, I'm inferring this, but I think that's a reason to infer that Congress would have wanted to constrict the agency's ability to make these group-based variations in situations where they don't have the transparent, reliable data that a cost study provides. I've got this so far. Dangerous. But I'm looking at two, and it says the average price for the drug in the year. Quite right. Calculated and adjusted as necessary for purposes of this paragraph. So I'm back to purposes. And you make a strong argument. You say, look, average price for the drug in the year is something that some people in the agency might read off a few charts, and they read that off from the drug store's sale price or whatever, and then they make some changes in it because it isn't quite right, but they can't go so far as to cut it 28% because they think the whole thing's too expensive. That isn't what purposes allows them to do. It's the smaller thing, not the bigger thing. So far, am I, are you, is that right? That's part of our argument. I know, part. Okay. Next one. Now, suppose I think, which I'm not sure, but it's possible. You know, I now see you could read it both ways. It's possible. Now, what do I do? And the natural instinct for me is to say Chevron. Ah, but Chevron's controversial, etc. And actually, when you think about it, Chevron's the wrong case. Because whatever Congress wanted done here, it didn't want to give the agency to choose. They did something definite. That word purposes means definite. It's definite. It means you're right or they're right. And so the right case is Skidmore. Now, that doesn't help you. Because Skidmore says when we get to something like they know more about it, just like A. James Kasner used to know more about property than I did, when they get to something they know more about, we ought to pay attention to them. So I don't want you to sit down, please, without saying something about Skidmore. Sure. Two points about that. I don't think Skidmore helps in this situation. And I think that's because this is not a question about the agency's expertise. This is a question about whether the agency is invoking the statutory purpose to go beyond the means that Congress prescribed for carrying out that purpose. That's a question of statutory interpretation. And this Court has said over and over again that agencies can't invoke purpose to go beyond the specific means that Congress prescribed. And I really think that's critical here. This was, I mean, micromanaging may be putting it a little too strongly, but Congress legislated with respect to this category of drugs in minute detail. It said, you're going to either do it this way, acquisition costs with a cost study that's statistically significant, or you're going to do it that way. You're going to set the average price for the drug for the year using the statutory formula. Now, of course, with the power to calculate and adjust as necessary for the purpose of the paragraph. But I think to read that language as necessary for the purposes of the paragraph, to give the agency essentially carte blanche to do whatever it wants, Congress is willing to disregard the fundamental judgment that Congress made when it enacted this provision. Justice Thomas? Justice Breyer? Anything further? Can I just take you back to Justice Thomas' first question? If the only way we can reverse the D.C. Circuit is to overrule Chevron, do you want us to overrule Chevron? Yes, we want to win the case, yes. Along those lines, counsel, say that I don't buy the argument that this case implicates the major question as doctrine, as you've suggested, and that adjustments in light of the purposes of this paragraph can be reasonably read as the D.C. Circuit said it could be read. And as some of my colleagues have suggested here today, I say I accept those things. You indicate that we should reconsider Chevron, and you just did again in response to Justice Alito. What would you have us replace it with? What would it look like in your world? Well, I think I wouldn't presume to tell the court what it should do in response to that question, but there are some options. And one certainly is to look at this statute and say, well, we don't think this is the case. We think this statute is unambiguous. I understand that, but the majority of the court disagrees with you about that, and you say you still want to win the case. What does that look like? Well, I think it could look like any number of things. One is, even if one thinks that the reading of the D.C. Circuit is within the realm of possibility, and its idea of dueling superfluities is a valid justification for invoking Chevron, which I don't think it is, that there's clearly a best reading of this statute, and it's our reading, because the consequence of reading it in the way that the government is asking you to read it is that you really do read. You take something that Congress prescribed as mandatory as a precondition for setting cost-based rates, and you turn it into an option that the agency is free to accept or reject as it wishes. That's clearly not the best reading of the statute, so I think that gets you to where we want to go. The other way, it seems to me, I think we're not really exactly invoking the major questions doctrine, but there's a corollary here, which is— None of that works for me, say. Then what? Well, I've told you, if you think that— Then you'll just pick the best reading, 51-49, you win, is it? Yes. Okay, nice. And you, in your cert petition, suggested that this case is part of a troubling trend, that though this court has emphasized repeatedly that lower courts should employ all the tools of statutory interpretation, as it turns out, at least according to your studies, only about 30 percent of them resolve cases at step one, and that this case is an example of what you call that troubling trend. I wanted to give you a chance to comment on that. Yeah, I'll just elaborate on the dueling superfluities point. I mean, that's the essence of the finding of ambiguity in the Court of Appeals, is that, well, our reading of adjust can't be right because overhead is already accounted for in other ways, so there's a superfluity there. True, there's a superfluity in the way the government wants to read it, because the mandatory, what seems like a mandatory cost study requirement, subclause A, for acquisition cost rates and variances among hospital groups, sure, that becomes superfluous in a sense, but there's no hierarchy of superfluity here, and therefore Chevron governs and we defer. Well, respectfully, as I tried to illustrate in my conversation with Justice Kagan, there isn't superfluity with our reading, but even if you grant that there is, there's a vast difference between superfluity in the sense of belt and suspenders, which is the superfluity accusation against our position, and superfluity in the sense of writing a whole column of the U.S. Code out of the Code entirely and telling the agency it doesn't have to do the very thing that Congress said it has to do. Justice Kagan? Justice Kavanaugh? I have a couple questions. To follow up on Justice Gorsuch's question, if you take footnote nine of Chevron seriously, that says to apply all the traditional tools of statutory interpretation and construction, and presumably if you do that, you get an answer. I understand that to be what you're saying we should do here and not give up too soon, but follow it all the way through. Right. I guess what we're advocating in the Court is essentially follow the path that was set forth for our deference in KISOR, the same idea here. You've got to exhaust the toolkit, and that requires consideration of context and structure and the overall operation of the statute, the provenance of the statute, all the things that you bring to bear. And if you do, we think there's one clear answer. And then a second question, more on what Congress was getting at here. You said they did this to protect against executive favoritism of particular kinds of hospitals. You didn't kind of connect that up to what happened here with the 340B hospitals, but I gather what happened is that HHS thought it was inappropriate to give this degree of subsidy to a certain category of 340B hospitals. Is that the accurate story, or what is the story? A couple of points about that. I want to be clear that political favoritism is an inference. There isn't any legislative history. But it seems like a quite reasonable inference to me. Regional favoritism, category favoritism. Now, with respect to 340B hospitals, yes, that's what the agency decided, that this subsidy had been around for a long time. It didn't want it to continue. And we're not saying that that's beyond the agency's authority. We're saying that if the agency wants to get rid of it, it's got two options, it seems to me. One is you follow the means that the statute prescribed for varying by hospital groups, which is you do a cost study, you come up with data that's statistically significant in which you can rely to justify the variation, and you vary it. And then if you don't want to do that, you think it's too burdensome, you think it's bad policy, you go to Congress and say change the law. But they didn't do either of those things. Instead, they took a shortcut that the statute doesn't authorize. Thank you. Thank you, Counsel. Mr. Michel. Mr. Chief Justice, and may it please the Court. Petitioners ask this Court to hold that Congress compelled Medicare to knowingly and dramatically overpay 340B hospitals for covered drugs at the direct expense of Medicare beneficiaries and other hospitals. Neither the statutory text nor common sense supports that result. First, Congress precluded review of covered drug rates for the same reasons that it precluded review of other OPPS rates. Those rates are bound together by the statutory budget neutrality requirement, and invalidating them years after payments have gone out the door would badly destabilize the Medicare system. Congress instead reserved review for itself. Indeed, as my friend said this morning, the highly detailed nature of this provision illustrates that fact. In any event, the rates here are lawful under that provision. Subclause 2 authorizes the agency to adjust rates, quote, for purposes of paragraph 14. Those purposes must include aligning reimbursement rates with acquisition costs. After all, that is what Subclause 1 expressly provides. And importantly, the cross-references in Subclause 2 are to proxies for acquisition costs. The two subclauses are thus different means to the same end. Petitioners have no plausible account of paragraph 14's purposes that exclude cost-based reimbursement. My friend said this morning that HHS could exclude price concessions or tailor the rate for different providers, but that's not materially different than what HHS did here. My friend suggests that 340B, Section 340B itself, ensures 340B providers a subsidy under Medicare. But that cannot be correct, because everyone agrees that Subclause 1 allows the agency to set the rate for 340B hospitals at acquisition costs. The agency here made a more modest adjustment, requiring 340B providers to share some of their discount with Medicare beneficiaries and other hospitals. That sound approach was well within the agency's statutory authority, and the decision below should be affirmed. Mr. Michel, it's hard to see what's left of Subparagraph 1 if we accept your argument, your interpretation of Subparagraph 2. Why would you ever collect survey data under Subparagraph 1 if you can do everything that you say you can do under Subparagraph 2? Well, Justice Thomas, the survey still provides a lot of benefits to the agency. That's the Subclause 1 authority. First of all, Subclause 1 makes it per se permissible for the agency to set rates at acquisition costs as determined by the survey. Now, in Subclause 2, the agency has to show a lot more than that. I don't think there's any dispute about the agency showing in this case, and I took my friend this morning to accept that there's no debate about this data. But that's idiosyncratic about this case, because, remember, HHS runs the 340B program, so it has that data. But there's all kinds of other data about hospitals that HHS could use under Subclause 1 if it took the survey to make as a basis for... So how often have you conducted Subclause 1 surveys? So the agency has only conducted one since the statute was enacted. When was that? That was in 2020 while this case was pending. I would note, though, that in the same instruction that Congress gave to the agency to conduct, quote, a periodic survey, it instructed the agency to take into account, and this is D-2, Sub 14-D-2, it told the agency to take into account the recommendations of the GAO, which conducted the original study back in 2004. And the recommendations of the GAO were, don't do very many studies, because they're very burdensome on the study takers, they're very burdensome on the hospitals, and they don't actually produce results that are all that accurate. In fact, the GAO said the proxy rate, the rate set under Subclause 2, is a better and more accurate rate than you'll often find under the survey. And so HHS, per the statutory instruction, has followed that approach. And I'll just say one word about the 2020 survey, and this is outlined in the Federal Register Notice. HHS, in that case, surveyed about 1,400 340B hospitals, and they gave them two options. They said, you can either tell us your acquisition cost, or you can check a box that says, just use the data you already have. Seven percent of the hospitals gave the actual data. Fifty-five percent checked the box, and 38 percent didn't respond. So the survey ended up producing a rate that was very similar to the rate that would have been produced by the agency using its own data, which is, of course, what it did here under Subclause 2. So what do I do with the fact that 3A, when it's calculating costs, says to you you can count almost any discount that's given to a hospital in the price that was established, except, and it bars you from using the discount given to 340B. What do I do with that statutory command not to include that in the average price data? How do you get the power to include it in the AOP, what is it called, the ASP? Does it seem contradictory that you're trying to sneak in through the back door or prohibition on the front door? No, I don't think so, Justice Sotomayor, and I have two basic answers to that. First, the reason that most discounts are included in the, this is the 1395W3A rate. Yeah, 3A. No, yeah, I know, but 340, that is the rate for reimbursing physicians, and physicians are not eligible for 340B discounts. So that's why that rate is excluded from 1395W3A. Now, the second point is it can't be the case that that provision, or 340B, imposes some kind of duty under the agency in this provision to give a subsidy to 340B hospitals because everyone agrees that if the agency took the survey, it could set the rate for 340B hospitals at acquisition costs implicit, or no discount, no subsidy. And there's no way Congress said you can do that under Subclause 1, but you lose that authority under Subclause 2. In fact, under Subclause 2, Congress allowed the agency to make an adjustment, and the adjustment to change the rate so that it's applicable to hospitals instead of just physicians is exactly the kind of adjustment Congress would have had in mind. But the adjustment... Well, we're probably going to ask the same question. I doubt it. All right, all right. I'll ask two questions quickly. One, as far as judicial review is concerned, where your problem is there are 12, there's five other provisions where there's no judicial review, and 14 isn't one of them, okay? So I don't know how you get 14 in there when it says a bunch of others, not 14. The second one is what he's saying is we have one and two, okay? One is cost, and two is price. Now, when you're supposed to use two is when cost fails. You have no cost figures, or they're all a mess, and you can't figure out cost. So now we go to two, which is price. Everybody knows price isn't as good as cost because we're trying to get at the cost, but two's about price. And so why would they put in there purposes, adjust for purposes, if they didn't mean price-based purposes? If they meant cost-based purposes or Section 2-based purposes, I mean, they wouldn't have destroyed one as they've done if we have your reading of two. I hope I've got that right. I don't know, but I think that's the argument. So I don't want to completely let the preclusion argument go, but I'll answer the second part of your question. I hope I can come back to that, but I will answer the second part of your question first, if that's okay. I think Subclauses 1 and 2 are pursuing the same end. They're both pursuing acquisition cost-based reimbursement. And the way we know that, this is following up on the question from Justice Sotomayor earlier, is that the cross-reference provision doesn't direct the agency to set the rate at price qua price or price simpliciter. It makes two important changes. It says add 6%. Everybody agrees that 6% is the acquisition cost. It's a little bit extra than it costs to acquire the drug. And then it says subtract most of the discounts, except 340B, and we have a good explanation for why it doesn't say 340B. That's acquisition cost. And that's not something the agency has come up with on the spot. That's been the agency's position the entire time, since 2006. And, in fact, in the 2006 rule, hospitals agreed that the ASP plus 6% is an accurate measure of acquisition cost. And, in fact, in the very rules at issue in this case, the agency set the rate... But, Mr. Shaffer, to say that the two have some relationship to each other, of course they do. But they're not the same in the ways that Justice Barrett pointed out, that the acquisition cost is really what a particular hospital has paid or a particular group of hospitals, and this average price, the average price for the drug, is something much broader than that, that does not suggest that you can vary it by hospital group or by individual hospitals. And the question here is why it is that you would read this little delegation at the end. It's a broad delegation in its place, but why you would read it to override the basic statutory structure here. The basic statutory structure here is you can charge acquisition cost when you've done a survey. And when you haven't done a survey, which the agency has refused to do for years, well, then, you don't get to do this. You have to do something else. Justice Kagan, a couple of answers. First, on the singular point, the average price, I don't think that can get my friend very smart because if you look at Subclause 1, it also refers to the average acquisition cost, and I think we all agree that that can be varied. One is varied by hospital group. The other is not varied by hospital group, so suggests a single uniform number. No, but respectfully, we would read the purposes of Paragraph 14. I think this comes back to a question Justice Breyer asked earlier. If you're trying to determine the purposes of a statutory provision, I think this Court has told us, look at the text of the statutory provision. The text of the statutory provision sets it up as if you do a survey, you can do one thing, and if you don't do a survey, you can't do that thing. And you're saying that this delegation should be read to say if you do a survey, you can do this thing, and if you don't do a survey, you can also do this thing. Justice Kagan, if the statute said if you don't do a survey, you can't do this, we'd be in real trouble in this case. But that's not what the statute says. The statute says, subclause 2, if acquisition cost data are not available, which everybody agrees they're not in this case. It's subparagraph 1 that makes the use of the acquisition cost conditioned on doing the survey. Explicitly. Justice Kagan, respectfully, I disagree. It doesn't say if. It says set the rate at average acquisition cost as determined by the Secretary, taking into account hospital cost survey data. Or, 2, if acquisition cost data is not available, the average price as adjusted... If you've done a survey, do the acquisition cost. If you haven't done a survey, do the average price. As adjusted by the Secretary for purposes of this paragraph. But not to override the point of doing the survey in order to get acquisition cost. Justice Kagan, I think the Court's opinion in Michigan versus EPA is helpful here. In that case, the Court was interpreting a provision of the Clean Air Act that allowed the agency to regulate as necessary and appropriate. The EPA's argument in that case was because another provision of the Clean Air Act directed regulation based on cost. It wouldn't read appropriate and necessary to include cost. And this Court... There was a dissent in that case, but the Court was unanimous on the proposition that the agency... It was unreasonable for the agency to read the statute in that way. Because a broad term like necessary and appropriate necessarily took account of cost. And the fact that it was enumerated separately in the statute did not express some kind of expressio unius inference. And here I think you have the opposite of expressio unius. Subclause 2 says, take into account the purposes of the paragraph. How could you be clearer about what the purposes of the paragraph are than to read subclause 1 of that paragraph, which says you can set the rate at average acquisition cost? And again, this is not a new argument. This is the position that the agency has had all along. And in this very rule, the agency set the rate for the other non-340B drugs at acquisition cost, not by rote application of the statutory cross-reference, but it explicitly said because that approximates average acquisition cost. And my friend representing the hospitals, many of which are not 340B hospitals, is not here telling you that that's unlawful, that that's inaccurate. I think that's because there's widespread consensus that subclause 2, that the cross-referenced rate is a proxy for average acquisition cost. I was concerned about Mr. Verrilli's... ..that the force of his argument was that the adjustments for purposes didn't mean anything. I think you have the flip concern, which you seem to think it means everything. Not at all, Mr. Chief Justice. I mean, paragraph 14 is not that broad. All you really have to hold in this case, of course, we think, is that paragraph 14's purposes include the very purpose that's specified in subclause 1 of paragraph 14. Now, you can certainly imagine the agency coming up with all kinds of reasons that it would like to adjust reimbursement rates up or down. There could be political favouritism. It could be that the agency likes hospitals that provide one particular service or dislikes hospitals that provide a particular service. None of that would be in bounds under this provision. The purposes of paragraph 14 are limited to those that are specified in the text of paragraph 14. And again, my friend made the point about the agency trying to read broadly statutory purpose. I just want to make completely clear, this is not an invocation of the purposivist canon of statutory interpretation. We're reading the text of the provision that directs the secretary to adjust for purposes of paragraph 14. But you're reading the text of the provision, Mr. Michel, as though the provision said, use average acquisition cost if you have survey data, or if you don't have survey data, do the same thing. And that's not what this provision says. This provision says if you have survey data, you do one thing, and if you don't have survey data, you do a different thing. Respectfully, Justice Kagan, the different thing is because it includes adjustment for the purposes of the paragraph. Yeah, you're saying the different thing is the same thing. But why would Congress have written a statute like that? If you have survey data, you can do this. If you don't have survey data, you can do that. But then we'll read the statute to make that mean this. No, I think Congress wanted the common-sense notion that reimbursement would reflect acquisition cost instead of, for example, in Justice Barrett's earlier example, someone who says, you know, I bought a car for $20,000 and I'd like to be reimbursed by my employer at the sticker price of $28,000. I mean, that doesn't make any sense, and there's no reason that Congress... But that's exactly what my friend's argument is in this case. Well, then you should go do a survey. Well, to be clear, we did do a survey, and I would also point out my friend objected vigorously to that survey, which I think really undermines the argument that that's a superfluous provision since he's invoking it against us in this very case. If the secretary does a survey, does the secretary have to survey all hospitals? Could the secretary do a survey of just the 340B hospitals? I mean, that's a very hotly... The 2020 survey, as I noted to Justice Thomas earlier, was just of 340B hospitals. We think that complies with the survey instructions in paragraph 14b. The 340B hospitals unsurprisingly don't because I think the 340B hospitals don't want the result of the survey because the survey is going to lead to lower rates for them, lower rates even than they have now under HHS's... Well, if the survey has to be of all the hospitals, that is the petitioner's position? There has to be a survey of all hospitals or no hospitals? I don't want to put words in my friend's mouth. Oh, well, okay, that's another question. I think there was a footnote in their brief where they objected to that aspect of the survey. Mr. Michel? I'm sorry. Well, if that's the case, then that does seem to provide an additional reason for what you've done under 2. So if you have a group of hospitals that indisputably pay less, but the only way in which you could adjust for that hospital group is to do a survey of all hospitals to provide you a way of doing... of making a much more targeted response to that particular provision, that particular situation. I think that's exactly right. It goes back to the point I made to the Chief Justice earlier that this is a sort of idiosyncratic case in that HHS has this data, the 340B data, because we run the program, and also there's been a decade's worth of independent studies that we cite. That's not going to be the case for all manner of other adjustments that HHS might want to make. And in fact, the original 2005 survey that I mentioned to Justice Thomas earlier drew distinctions between teaching hospitals, urban hospitals, large hospitals, and the GAO found that there are significant differences in all those different categories. But because we don't have that data, we're not going to make adjustments based on that in our Subclause 2 data. All we're saying is that here, where we do have the data, which I take it my friend doesn't dispute, we can take that into account to make a modest adjustment. And his position has to be that Congress compelled the overpayment. And I don't want the point to slip away that that overpayment comes at the expense, just a half sentence, at the expense of Medicare beneficiaries and other hospitals, which is right in the teeth of the purpose of this statute. But the word overpayment, with respect to 340B hospitals, is questionable, isn't it? At least the amicus brief suggests. They provide, they're about a third of the dish hospitals in the country, they provide a huge amount of the uncompensated care in the hospital. But a lot of them, as the amicus brief points out, are in rural areas, Kentucky, West Virginia, the states are listed, Arkansas, in the amicus brief, Texas, rural areas. And those hospitals say that, and Congress is well aware of this, and so to say overpayment I think is part of the picture but doesn't take account of the whole 340B picture, which is more complicated. Two points, one of which I've made already, but I think it's important. Congress allowed HHS to take out the whole 340B discount and set the rate at acquisition costs if it takes a survey. But that's a constraint, because then the agency would have to treat the hospitals the same. No, subclause one allows... I'm sorry, it's a constraint. Unless they did that, the agency would have to treat the hospitals the same, only if they do the survey. So it's a precondition. My point again is that that's not what the statute says, and I don't understand how Congress would have had that purpose in subclause one and somehow abandoned it by subclause two, where it gave the agency authority. But to take your more factual point, I would urge you to read, as I know you have, the amicus briefs of the Federation of American Hospitals and the rural hospitals that are filed on our side of the case, and those briefs explain that the rural hospitals, in particular, have relied on the offsetting 3.2% adjustment that we made in this rule to provide care to their patients. And also the Federation of American Hospitals represents for-profit hospitals, but many of those provide equally large levels of care to uninsured persons and other people, too. So I don't think it's as simple as saying 340B hospitals have some kind of distinctive entitlement to that. I want to make clear, the agency supports the work of 340B hospitals. You know, we make major dish payments to them. We're certainly not here saying that the work shouldn't be valued. What we're saying is that the Medicare program was not designed to subsidize 340B hospitals. And just the last point on 340B, I want to stress three things really quickly. One, they're keeping a lot of the overpayment here because we made a modest adjustment. Two, they're keeping a lot of the discounts that they get under 340B because we're only talking here about Medicare. Obviously, they benefit from the 340B discounts in all of their other operations, private insurance, state insurance, et cetera. And third, they themselves benefit from the 3.2% offsetting adjustment because that goes to all of their OPPS services, and obviously 340B hospitals provide a lot of those services. Mr. Rochelle, I want to return to the question of Chevron deference here. You know, your friend on the other side has said that we should, you know, apply a Kaiser versus Wilkie approach here, emphasize that lower courts in applying Chevron need to apply all of the tools in the toolkit. And a lot of the questions that you've been getting that we've been going back and forth about have to do with the problem that there's superfluity maybe on either side of this. So I would have thought that the theory of Chevron is that when there's ambiguity in a statute, maybe vagueness would be the better description, that that's an indication that Congress has delegated authority to the agency to fill it. But the D.C. Circuit described it this way. It said, when competing readings of a statute with each occasion their own notable superfluity, that manifests the kind of statutory ambiguity that Chevron permits the agency to weigh and resolve. Does the government agree with that statement of when Chevron deference applies? I think that is an accurate statement about Chevron deference. I mean, of course, our principal submission here is that you don't need to apply Chevron deference because we have the better reading of the statute. And again, I think really the key question in this case is what does the textual phrase purposes? Oh, but I don't think it is Chevron. And I was serious about that. Why? Because Chevron, you go back and look, what would a reasonable legislator, who didn't give this two seconds thought, would a reasonable legislator have wanted to give the agency the power to do either? Perhaps first one, then the other. It could change its mind. Okay? The answer to that question must be no. Because if you're right, those words, purpose, gave the agency a big power, and Justice Alito went into it to some degree, and others have, and so did Justice Kagan, a big power, Roman numeral two. And if they're right, it was a little power. And it's an important question in this area. And I don't really see how a reasonable person in Congress would have wanted to give the agency the power to first interpret it the one way, then interpret it the other way. But there is a ready-made doctrine for the situation I'm describing, and that's Skidmore. So what do you think? I'm not as definite as I sounded. I'm not here to reject any kind of deference you want to give us. You want to get this right for the reason that it has implications well beyond this case. Right. So, Justice Breyer, the provision that we're interpreting here says, as calculated and adjusted by the secretary as necessary for purposes of this paragraph. I think you'd be hard-pressed to find a more explicit delegation of authority to an agency. Of course there's delegation. But the question is, does that word purposes mean purposes more directly related to Section 14? Or does it mean purposes that might be broad enough to come in under 2? And that would underscore Justice Kagan's point about eviscerating, through the use of 2, the limitation that is set in 1. Now, having listened to this, and not before, I do think it's a fairly important question. And I don't see how the agency would be given the power to shift from the one to the other, this year the one, the next year the other. Okay? That's where I'm at this moment. I'll change probably 50 times. Sure. So I think, as a doctrinal matter, this is clearly a Chevron case, in that there's an express delegation of authority to the secretary. The secretary issued a notice-and-comment rule in which it explained the reasons for its legal interpretation. In some ways, this is almost more of a State Farm question, in that the question is, what factors can the agency consider when it interprets the phrase, purposes of Paragraph 14? And I take my friend to have... My friend has the argument that the purposes of Paragraph 14 don't include aligning reimbursement costs. We think that they do. But in either event, I don't think there's any existential, broad Chevron question going on here. I think you could view it as a Step 1 argument. You could view it as a State Farm argument. But this fits clearly within the doctrinal box of Chevron. In one sentence, what is the purpose of this paragraph? How do you define that? I would say, at a minimum, it includes setting the reimbursement rate equivalent to drug acquisition costs. After all, that's the purpose that's specified in Paragraph 1. And by the way, that's also the purpose... When you look at the purposes of the paragraph, I think you have to look at it within the context of the broader statute. The Medicare statute, as this court said in the Regents Hospital case, has a pervasive focus on cost-based reimbursement. The OPPS program, Paragraph T that we're looking at, has all kinds of references to costs, labor costs, wage costs, other things like that. And it's just a common-sense understanding of the notion of reimbursement. So I think all of those things illustrate that whatever the purposes of Paragraph 14 are, they have to at least include that. Now, I also think if you look at... Sorry, I said one thing. Mr. Michel, can I just return to my question from before? Because I think I actually do see this a little differently than as Justice Breyer posed the question to you. So the D.C. Circuit said that the basis for Chevron deference here was that resolving which superfluity was worse was one for the agency. Is that kind of statutory interpretation difficulty one that should trigger any kind of deference, whether it be Chevron or Justice Breyer was, you know, posing Skidmore? It seems to me that that might be just an interpretive question. You know, the classic problem of statutory interpretation that a court should resolve, that the APA says courts resolve, as opposed to one that reflects some sort of delegation to the agency. So, I mean, as I said, I think there's a clear delegation to the agency here. I think that the court has many times deferred to HHS in interpreting Medicare statutes. We do think deference is warranted here. We also recognize, as I think Justice Kavanaugh said earlier, footnote 9 of Chevron indicates that a court should, you know, apply all the tools of statutory construction. We accept that approach, and that would include looking at superfluity questions. So you would reject that statement of when Chevron deference would be appropriate? No, not at all. I just meant to say it's appropriate for the court to... And I understand you have other reasons for asking for Chevron deference. I'm just saying, if that were the basis, would you say that that's an accurate statement of when Chevron deference should apply? I think it is. You know, but not only do I not think Chevron is necessary in this case, I don't think that particular application of Chevron is necessary in this case either. Well, I think you're saying... No, please go ahead. Absolutely. Go ahead. All right. I did want to follow up. I think we probably both are going to wind up asking the same question in truth this time. In your answer to Justice Barrett, I think you focused on, you know, the competing problems of both interpretations. They both create a superfluity. And is that enough ambiguity? In my mind, I think of that not as a delegation question. You've got some language talking about delegation in the statute. Fine. But the question that Chevron tends to pose, the difficulty with lower courts and with this court, is what's ambiguous enough to trigger deference to the government? And in a lot of circumstances where we don't have Chevron applicable and have competing statutory problems, we go down and apply all the tools of statutory interpretation that Chevron footnote 9 says and you've endorsed, and we come up with an answer. It may be 51-49. It may be really close. You both have spots. You both have weaknesses. But we have to pick one, and we do. And we're always able to do it. So why shouldn't that be true here? Sure. I mean, I want to make, to be clear at the outset, we're not conceding that there's superfluity on both sides. I mean, we think that... Suppose there is, because you also say the D.C. Circuit was right to invoke that as a basis for Chevron deference, correct? I agree that that is theoretically true. I'm not sure the D.C. Circuit was saying that the government's reading is superfluous. So you both created that problem and that therefore Chevron deference is appropriate. You say it's warranted on that grounds. And so I guess I'm just asking, why in this particular area, why in this case, when we're able to resolve these cases, as Mr. Verrilli said in other situations, 51-49 without any problem? Well, I mean, again, I would reread the... I don't think that's what the D.C. Circuit was saying. I think that it said that it made essentially the argument that we're making here, which is the purposes of paragraph 14 include those that are specified in subclause 1, and there is no superfluity because... So maybe I'll ask you a question more generally. How much ambiguity is enough? That's a, you know, you could write a whole law review article about that. Somebody has. Yeah, I know. You know, I don't think I can give you an answer to that question, Justice Gorsuch, but, you know, I suppose I would say we agree that you would apply the tools of statutory interpretation. So the government can't tell us how much ambiguity is enough? I'm not sure anybody's answered that question. It's been a long time. But at a minimum, in this case, I don't think there's much ambiguity at all because the purposes include those that are specified in the paragraph. Justice Thomas, any other... Justice Gorsuch, can you... Can't help myself, sorry. One last question. If the government can't tell us how much ambiguity is enough, 40 years almost after Chevron, and these cases always tend to arise, or often tend to arise, in circumstances just like this, where the government's seeking deference for a rule that advantages it. We saw one yesterday. Here's another one. Advantage the federal FISC at the expense of hospitals that serve low-income patients and who are relatively politically powerless and cannot capture agencies or lobby them as effectively as others. What are your thoughts about that? I have to start, Justice Gorsuch, by saying that's not this statute. This statute does not advantage the federal FISC. It expressly calls for reallocating the funds among other hospitals. And as I said, in direct correspondence with the $1.6 billion downward adjustment that HHS made in this case to align 340B hospitals' reimbursement with their costs, it reallocated 3.2% to all other providers of OPPS services. To other more favored providers. Well, no. These providers wouldn't be here if they weren't hurt, right? You don't dispute that the 340B hospitals have a complaint? I don't dispute that they have a complaint. I would point out, as I think I did earlier, that they actually benefit from the 3.2% increase as well. And if you read the Federation of American Hospitals' amicus brief, it cites a study indicating that nearly half of 340B hospitals come out ahead under these rules. We're not disputing their standing. They certainly do have an interest in obtaining the higher, you know, extra payments. But I did want to take issue with the characterization of the statute as one that is meant to advantage the federal government because the budget neutrality requirement makes clear that that's not how this particular statute operates. To pick up on Justice Barrett's and Justice Gorsuch's question, I would think the tools of statutory interpretation that are referenced in Chevron footnote 9 would include resolving competing CERP affluities, no? I think it could, you know, but I think the D.C. Circuit, in this case, applied all of the canons of statutory interpretation and concluded that there was, in its view, still some ambiguity. Although I will say the opinion does not, at least I don't think, respectfully, the opinion reads like a case where the D.C. Circuit threw up its hands and said we're just going to go with whatever the government says. There's a detailed statutory analysis by Judge Srinivasan on behalf of the court in which he goes through lots of different canons of interpretation and ultimately we understand the holding of the D.C. Circuit to be that the language purposes of paragraph 14 include aligning reimbursements with acquisition costs, which, although done within the Chevron framework, is an interpretation that doesn't ultimately require Chevron deference. And second question, I don't think we've talked enough about the word adjust. I mean, that's not a word of breadth as the MCI decision seems to be on point here in saying don't read a word like modify or adjust, which imply something modest, to allow this kind of broad effort as Justice Kagan's questions pointed out. So on that word adjust, even though you have the purposes of the paragraph, it's still linked back to calculated and adjust. Adjust seems modest. Well, I think adjust has to take its meaning from, like most statutory terms, from context. I mean, if somebody said I'm going to adjust my spending patterns because there's a new bridge toll or said I'm going to adjust my spending patterns because I have a child in college, those would mean two different things. And it would mean its meaning would come from context. And here the context is making an adjustment. I mean, of course, our whole position in this case is that it means making an adjustment that corresponds to the difference between acquisition costs and reimbursements. And if that difference was 5% and we made a 50% change, I think you would say that's not an adjustment. I think you'd probably also say it's not for the purposes. But in this case, everybody agrees that the change is a modest, conservative estimate, cautious estimate of that change. But the adjustment, this is going to repeat Justice Kagan's question a little bit, but I'll close with this. The adjustment ends up eradicating the requirement to do the survey and allows you to accomplish the end that the statute permits only with the survey just by calling it an adjustment. So just to come back to that point, I mean, what the statute requires with respect to the survey is that the secretary take it periodically, that's D-2, 14-D-2, after taking into account recommendations from GAO. The fact that subclause 2, the provision we're so focused on here, starts with if hospital acquisition cost data are not available, that means that Congress had to contemplate that there would be years in which the agency didn't take the survey and that it wanted it to use this rate. So there's no requirement that the agency take a survey and the agency's not, other than periodically. But my friend's argument here was not that the agency failed the periodic requirement. So I think the agency is not evading the survey requirement because there is no survey requirement in this case. On adjust... Thank you. Ms. Kagan? Yes, Mr. Barrett? Thank you, counsel. Rebuttal, Mr. Verrilli? Thank you, Mr. Chief Justice. I've got four points, and in the second point, Justice Alito, I'll address your question about the studies. The first point, I think the essence of my friend's argument here is that subclause 1 and subclause 2 are two paths to the same end, and it's all about the ends. Respectfully, I submit that this statute is all about the means. Congress had given the agency the authority in paragraph 2A, 2 previous to this statute, to consider costs in a discretionary way. This statute came along and said, no, no, for these drugs, we're taking that discretion away. We're telling you exactly how to do it in minute detail. And I'm sure that this provision was the consequence of a hard-fought legislative compromise. You just read it, and you see how much care and specificity went into it. So this is cases about the means, not the ends. Second, with respect to the issue of accuracy, a few points here. First, with respect to the study that the agency has conducted, Justice Alito, the statutory requirement is that the survey conducted shall have a large sample of hospitals that's sufficient to generate a statistically sufficient significant estimate of average hospital acquisition costs for each specified outpatient drug. So it's not that it's either only 340B or all hospitals. It's you've got to meet that general requirement. And you heard what my friend described in terms of their ability to gather, their effort to gather data with respect to this study. Seven percent of the hospitals, was it, that gave them the data they wanted? Another 53 checked the box and a whole lot of them didn't respond. There's no way that that study is going to meet the requirement of the statute. And then more generally, the study on which the government relies here to drop the rates 22 point some odd percent. You know, the government has said repeatedly that we don't contest the accuracy of it. I would note that the government itself recognized its flaws. MedPAC, the entity that did it, recognized its flaws. And MedPAC, the entity that did it, had so little confidence in the result that it recommended only a 5.3 percent drop in the rates for 340B hospitals. Not four times that rate, which is what the government did. Third point with respect to effects here. I mean, Justice Kavanaugh alluded to this. I think it's important to understand the full picture. That you take this 1.6 billion dollars away from these hospitals, you are reducing the care that they provide to underserved populations by that amount. And at the same time, other Medicare beneficiaries are going to pay more because this statute is budget neutral. That's true. But what that means is that there's an extra 1.6 billion a year that raise the reimbursement rates for other services, which in turn raise the co-pays for those other services. So other people are going to be paying more as a result of this judgment. So I just don't think that that's a meaningful argument. And finally, the question with respect to Chevron deference is how much ambiguity is enough? I think the answer is way more than you have here. Thank you. Thank you, Counsel. The case is submitted.